UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

DANIEL BARTON,                    )
                                  )
            Plaintiff,            )
                                  )     No. 4:07CV00067 FRB
                                  )
v.                                )
                                  )
                                  )
MICHAEL J. ASTRUE,                )
Commissioner of Social Security,[1] )
                                  )
            Defendant.            )

**MEMORANDUM AND ORDER**

        This matter is on appeal for review of an adverse ruling
by the Social Security Administration.  All matters are pending
before the undersigned United States Magistrate Judge, with consent
of the parties, pursuant to 28 U.S.C. § 636(c).

**I.    Procedural Background**

        On August 28, 2002, Mr. Daniel Barton ("plaintiff") filed
applications   for   Social   Security   Disability   Benefits   and
Supplemental Security Income benefits.  (Administrative Transcript
("Tr.") 66-70; 100-02.)  These applications were denied on November
8, 2002.  (Tr. 87-90.)  On December 19, 2002, plaintiff filed a

_____

        [1]Michael J. Astrue became the Commissioner of Social Security on
February 12, 2007. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil
Procedure, he shall be substituted for Acting Commissioner Linda S. McMahon,
and former Commissioner Jo Anne B. Barnhart, as defendant in this suit.  No
further action need be taken to continue this suit by reason of the last
sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

-1-

request for a hearing before an Administrative Law Judge ("ALJ"), and on April 23, 2004, a hearing was held in Jefferson City, Missouri, before ALJ Robert Ritter. (Tr. 86; 33-59.) On September 8, 2004, Judge Ritter issued his Decision denying plaintiff's claims for benefits. (Tr. 22-30.) Plaintiff filed a Request for Review of Hearing Decision with defendant agency's Appeals Council, which denied plaintiff's request for review on May 26, 2006.[2] (Tr. 3-7.) The ALJ's decision thus stands as the final decision of the Commissioner. 42 U.S.C. § 405(g).[3]

## II. Evidence Before the ALJ

### A. Plaintiff's Testimony

At the hearing on April 23, 2004, plaintiff was represented by attorney Gary Matheny, and responded to questioning from counsel and the ALJ. Plaintiff was born on July 21, 1954, and was 49 years of age at the time of the hearing. (Tr. 38.) He completed the eleventh grade of high school, and did not obtain a GED. (Tr. 38, 50-51.) After leaving high school, plaintiff entered the Army and attained the rank of E-4. (Tr. 50-51.) Following discharge, plaintiff was a member of the reserves for one year. (Tr. 51.)

---

[2] The Appeals Council indicated that it received and considered medical records from St. John's Clinic dated December 10, 2004 through March 7, 2005. (Tr. 6.) These records are incorporated into the summary of the medical records which appears herein, infra.

[3] The record indicates that, on December 19, 2006, the Appeals Council granted plaintiff additional time to file his civil action in this Court. (Tr. 16.) Plaintiff filed the instant Complaint on January 16, 2007. (Docket No. 1.)

Plaintiff's last employer was Doe Run, a mining company. (Tr. 38-39.) Plaintiff worked for Doe Run from 1999 to 2002 as a maintenance worker, and a mine utility worker. Id. As a utility worker, plaintiff was responsible for driving trucks, running loaders, shoveling, and lifting power cables and other heavy materials. (Tr. 38-39.) As a maintenance worker, plaintiff performed mobile maintenance on trucks, dump trucks, loaders, and large diesel motors. (Tr. 39.) From 1988 to 1999, plaintiff worked for Azarco, another mining company, and performed the same maintenance duties he described performing for Doe Run. (Tr. 39-40.) Approximately ten years ago, while employed at Azarco, plaintiff developed carpal tunnel syndrome, and had surgery performed on both hands. (Tr. 40.) Plaintiff testified that his right hand is fully functional, but his left hand is not. (Tr. 41.) Plaintiff is right-hand dominant. Id.

Plaintiff testified that his back problems began in 1989 and have worsened. Id. Plaintiff is currently receiving treatment and medication at the Veteran's Hospital. (Tr. 42.) Plaintiff testified that he is taking Amitriptyline[4] to aid sleep, explaining that he has trouble sleeping due to pain in his back. Id. Plaintiff testified that his back hurts him "most of the time" and was worse in the morning, and that he sometimes required assistance

---

[4]Amitriptyline, also known as Elavil, is used to treat symptoms of depression.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682388.html

getting out of bed due to stiffness and soreness.  Id.  Plaintiff testified that he sometimes threw his back out while simply walking across the floor, and described an incident that had occurred three weeks ago, in which he picked up a pair of pants and experienced pain in his left lower back that caused him to fall.  (Tr. 43.) Plaintiff testified that he still had pain from this incident in the form of a knot in the left side of his back.  (Tr. 44.) Plaintiff was wearing a back brace at the hearing, and testified that it was a different brace than his doctor had recommended inasmuch as it contained magnets.  Id.  Plaintiff testified that he wore the brace when mowing his lawn or when outside his home doing other things, but did not often wear the brace when inside the house.  Id.  Plaintiff uses a riding lawn mower, even though he has a small yard.  Id.  Plaintiff testified that he spends 30 minutes mowing the yard, and sometimes has to stop and rest due to back pain.  (Tr. 44-45.)

Plaintiff testified that he suffers from depression, which he partially attributed to his back pain, and sometimes does not feel like getting up and doing anything.  (Tr. 45.)  Regarding his daily complaints, plaintiff testified as follows:

> Well, when I get up in the morning it's, you know, it's hard, and I'd say maybe a half hour or so later I move around a little better, and it will get a little better but I still don't want to do nothing.  And, you know, the pain will go down the legs if I hurt it good like on my pants deal.  I hurt pretty good that day.  I just hurt all the time it just seems like.

(Tr. 45.)

Plaintiff testified that he felt unable to return to his past work operating trucks because his medications caused drowsiness, and because he felt unable to sit for long periods of time or climb into the truck cab. (Tr. 46.) Plaintiff further testified that he felt unable to sit comfortably for longer than 30 minutes, and was unaware of any work that he felt he would be able to do. Id.

In response to questioning from the ALJ, plaintiff testified that, while at home, between the hours of 8:00 a.m. and 8:00 p.m., he would lay down two or three times per day, for periods ranging from fifteen minutes to over an hour. (Tr. 47.) Plaintiff explained that, if he took a pain pill before lying down, he would lay down for two to three hours. Id. Plaintiff testified that he slept for only about five or six hours per night and was unable to get a restful night's sleep, whereas before he hurt his back, he easily slept for eight or nine hours. (Tr. 47-48.)

The ALJ asked plaintiff whether a doctor had told plaintiff what was wrong with his back, whether he had arthritis or a ruptured disc, and plaintiff responded, "Well, it's the arthritis, and it's also that lumbar. I don't know the proper name that he called it. I constantly pull my lower back on both sides." (Tr. 48.) Plaintiff testified that he pulled his back more than once per week, and that each time this happened, he was unable to do anything for one to three days. Id. Plaintiff testified that

-5-

he once hurt his back at work, and was unable to do anything for five days, and that a workers' compensation claim regarding this injury was currently pending. (Tr. 48-49.) Plaintiff has received no money to date. Id. Plaintiff measured his pain as 50 to 60 on a 1 to 100 scale, and testified that he had not yet taken painkillers that day. (Tr. 49.)

Plaintiff spends his time watching television, and sometimes visits the local barber shop or restaurant and talks with people there. (Tr. 50.) During warm weather, plaintiff sometimes goes fishing, but doing this hurts his back. Id. The ALJ asked plaintiff whether any doctor recommended that he exercise, and plaintiff replied, "Well, Veteran's has and I was supposed to start trying to go up there, but right now I just don't have the money to go anywhere." Id. Plaintiff testified that epidural steroid injections had provided only temporary relief, and that within a couple of days, he was "back to square one." (Tr. 51-52.) Plaintiff testified that surgery was never recommended to him. (Tr. 52.) Plaintiff testified that he had recently lifted a gallon of milk without pain. (Tr. 53.) Plaintiff testified that pain in his back causes him to fall when he tries to walk, and initially testified that he would be able to stand in one place for a longer period of time than he could walk, but then stated he was unsure. (Tr. 53-54.) Plaintiff testified that he was unable to bowl, play golf, or hunt like he once did. (Tr. 55.)

The ALJ asked plaintiff whether he had enjoyed his work,

and plaintiff replied "Yes, I enjoyed it. The last job I had was probably the best job I ever had." Id. The ALJ asked plaintiff whether he missed his work, and plaintiff replied, "Yes. It was something different every day. I never did the same thing day after day, and I really enjoyed it." Id. Plaintiff testified that he had planned to continue working to age 65. Id. Plaintiff testified that he is receiving a monthly disability pension of $100.00 from Doe Run. (Tr. 55.) Plaintiff testified that, in the past twelve months, he had visited the Veteran's Administration Hospital "five or six times" for complaints related to his back. (Tr. 58.)

The ALJ also heard testimony from plaintiff's wife. Mrs. Barton testified that she rubbed prescription heat-activated lotion on her husband's back every day. (Tr. 56.) Mrs. Barton testified that plaintiff was nervous, had a great deal of trouble getting around, and was frustrated by his physical limitations. Id. Mrs. Barton testified that she helps plaintiff out of bed three or four times per week, and has also helped him put on his socks and pants because he was unable to raise his legs due to lower back pain. (Tr. 57.)


B.  Medical Records

The record indicates that plaintiff received treatment from Shawn Hudson, D.O., from March 6, 1991 through December 11,

2002.[5]  (Tr. 160-207.)  On his initial visits to Dr. Hudson, plaintiff's complaints ranged from cold symptoms to neck and shoulder pain, headaches, and abdominal pain related to a possible kidney stone.  (Tr. 207; 191-93.)  On an April 23, 1999 annual questionnaire administered by Doe Run, plaintiff reported sleep difficulties, forgetfulness, and trouble hearing.  (Tr. 189.) Physical exam was essentially normal, and plaintiff was assessed with hyperlipidemia[6] and low-grade hearing loss.  (Tr. 188.)

On August 30, 1999, plaintiff reported to Dr. Hudson that he had experienced pain in his back while picking up something. (Tr. 190.)  Plaintiff was diagnosed with a lumbar strain and spasm, and was given Soma[7] and Lortab.[8]  Id.  On September 20, 1999, he reported pain in his left index finger after being hit with a hammer, and was apparently given Tylenol.  (Tr. 187.)  On January 24, 2000, plaintiff complained of insomnia and anxiety, and reported that he had been taking his wife's prescription Amitriptyline.  (Tr. 186.)  Plaintiff was given his own

_____

[5]The record indicates that Dr. Hudson was the company doctor for Doe Run, and that plaintiff received treatment from him both in this capacity and also as a private patient.  (Tr. 160-212.)

[6]Hyperlipidemia is the presence of excess fats, or lipids, in the blood. http://www2.merriam-webster.com/cgi-bin/mwmednlm?book=Medical&va=hyperlipidemia

[7]Soma, or Carisoprodol, a muscle relaxant, is used with rest, physical therapy, and other measures to relax muscles and relieve pain and discomfort caused by strains, sprains, and other muscle injuries. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682578.html

[8]Lortab is a combination of Acetaminophen and Hydrocodone, and is used to relieve moderate to moderately severe pain. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a601006.html

prescription for Elavil, the name brand form of Amitriptyline. <u>Id.</u>
On February 2, 2000, plaintiff complained of persistent shaking in
his right arm and hand. (Tr. 185.) Plaintiff was diagnosed with
Tardive Dyskinesia,[9] and was given medication. <u>Id.</u> Plaintiff
returned to Dr. Hudson on February 16, 2000, with complaints
related to a cold. (Tr. 184.)

On April 27, 2000, plaintiff saw Dr. Hudson for an
industrial physical exam, which was normal. (Tr. 178.) On
September 11, 2000, plaintiff saw Dr. Hudson with complaints of low
back pain and pain in the groin area, and was noted to have an
inguinal hernia and low back strain with pain and spasm. (Tr.
177.) Plaintiff was referred for hernia evaluation, and was given
Lorcet.[10] <u>Id.</u> Dr. Hudson's record includes a notation that
plaintiff had hernia surgery on September 21, 2000. <u>Id.</u> The
record also indicates that plaintiff was given an injection of
Demerol.[11] <u>Id.</u>

On January 15 and 16, 2001, plaintiff saw Dr. Hudson with
complaints of neck stiffness over the preceding two to three weeks.

---

[9]Tardive Dyskinesia is a neurological disorder characterized by
involuntary uncontrollable movements especially of the mouth, tongue, trunk,
and limbs.
http://www2.merriam-webster.com/cgi-bin/mwmednlm?book=Medical&va=tardive+dyski
nesia

[10]Lorcet is a combination of Acetaminophen and Hydrocodone, and is used
to relieve moderate to moderately severe pain.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a601006.html

[11]Demerol, or Meperidine, is a strong painkiller.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a601155.html

(Tr. 175-76.)  Plaintiff was given Flexeril,[12] and hot packs and vibration treatment were administered to his neck, shoulder and back.  Id.

On July 18 and August 9, 2001, plaintiff saw Dr. Hudson with complaints of low back pain, and his diagnosis was noted as "low back pain."  (Tr. 173-74.)  On October 31, 2001, plaintiff told Dr. Hudson that his back still "knots up" and that he felt he would "just have to live with it."  (Tr. 172.)  On March 22, 2002, plaintiff complained of left lower back pain which began while shoveling at work.  (Tr. 163.)  Dr. Hudson diagnosed acute low back pain and lumbar strain, and gave plaintiff Lortab, Prednisone,[13] and Valium.[14]  Id.  On August 7, 2002, plaintiff complained of right-sided lower back pain.  (Tr. 162.)  Dr. Hudson continued plaintiff's Valium and Lortab prescriptions, gave plaintiff an injection of Demerol, and excused him from work for two days.  Id.

In an August 26, 2002 letter, Dr. Hudson wrote simply: "In regards to Daniel Barton - Restriction's - No bending grader [sic] than 15 minutes per hour, No lifting grader [sic] than 10

_____

[12]Flexeril, or Cyclobenzaprine, is used to relax muscles and relieve pain caused by strains, sprains, and other muscle injuries. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682514.html

[13]Prednisone is used to treat the symptoms associated with low corticosteroid levels. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a601102.html

[14]Valium, or Diazepam, is used to relieve anxiety, muscle spasms, and seizures, and to control agitation caused by alcohol withdrawal. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682047.html

lbs., and No stooping." (Tr. 159, 263.) Dr. Hudson indicated no rationale for the assessment of these limitations. See Id.

On September 30, 2002, plaintiff saw Dr. Hudson with complaints of severe back pain. (Tr. 161.) Plaintiff was diagnosed with severe low back pain and insomnia, and was given medication.[15] Id.

On October 24, 2002, plaintiff was examined by John Demorlis, M.D., at the request of defendant agency's disability determinations. (Tr. 256.) Dr. Demorlis noted that plaintiff claimed to have a herniated disc, but that he did not describe a CAT scan or MRI to confirm this, and only reported having an MRI four or five years ago and could not remember the results. Id. He noted no specific injury, and stated he had been having back trouble for ten to fifteen years. Id. Dr. Demorlis noted that plaintiff had worked as a truck driver and performed other duties at the mine until he injured his back, and further noted that plaintiff had worked there for sixteen years. (Tr. 257.)

Plaintiff complained of pain up and down his back and down his posterior legs, but no numbness. (Tr. 256.) Plaintiff

_____

[15]Regarding medications, Dr. Hudson's note indicates "MS 30 mg IM (with) Reglan 10 mg IM." (Tr. 161) (parenthetical notation added.) "MS" is an abbreviation for, inter alia, Morphine Sulfate. http://www.medilexicon.com/ medicaldictionary.php?s=Morphine+Sulfate. Morphine Sulfate is a strong painkiller. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/ a601161.html. Reglan is used to relieve nausea and vomiting. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a601158.html. The abbreviation "IM" stands for, inter alia, intramuscular. See http://www.medilexicon.com/medicaldictionary.php?s=Intramuscular. It therefore appears that plaintiff was given an injection of Morphine for pain, and an injection of Reglan to combat nausea and vomiting.

-11-

stated he was in pain daily, and was "not bad" in the morning but increased to a "seven or an eight" later in the day. <u>Id.</u> Plaintiff claimed he could walk about two blocks, stand and sit for 30 minutes, ride in the car for 40 miles, and carry/lift "a glass of water." <u>Id.</u> Dr. Demorlis indicated that plaintiff, when encouraged, later stated he would be able to lift a laundry basket. <u>Id.</u> It was noted that plaintiff was taking Allegra,[16] a Hydrocodone/Acetaminophen combination, Flonase,[17] Amitriptyline (Elavil), and Diazepam (Valium). (Tr. 256.)

Upon exam, plaintiff had right superior sacroiliac pain, and his straight leg raise was 80 degrees on the right. (Tr. 258.) He had no peripheral edema or significant defects in his extremities. <u>Id.</u> His grip was +5/+5, his gait was normal, and he was able to do a full squat and walk on his heels and toes. <u>Id.</u> Plaintiff had minimal limitation of range of motion of his lumbar spine. (Tr. 261.) It was noted that plaintiff exhibited "good" and "normal" effort. (Tr. 261, 262.) Dr. Demorlis indicated that plaintiff had no sensory and/or reflex abnormalities, and that plaintiff could get on and off the examining table normally, and had normal gait and station. <u>Id.</u> Dr. Demorlis assessed chronic back pain. (Tr. 259.)

---

[16]Allegra, or Fexofenadine, is used to relieve the symptoms of seasonal allergies.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a697035.html

[17]Flonase, or Fluticasone, is a nasal spray used to relieve the symptoms of seasonal and perennial allergies.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a695002.html

Dr. Demorlis offered no opinion regarding plaintiff's ability to work. See (Tr. 256-62.) Dr. Demorlis offered no opinion regarding plaintiff's ability to maintain positions such as sitting or standing, or perform physical maneuvers such as walking or lifting, over the course of an eight-hour work day. Id.

On November 4, 2002, Ms. Stephanie Schepers completed a physical residual functional capacity ("RFC") assessment.[18] (Tr. 111-18.) Therein, Ms. Schepers found that plaintiff could occasionally lift 50 pounds and frequently lift 25; stand and/or walk for about six hours in an eight-hour day, and push and/or pull without limitation. (Tr. 112.) Ms. Schepers indicated that these limitations were due to plaintiff's subjective complaints, and noted that his October 24, 2002 examination indicated slightly decreased lumbar range of motion and a slightly positive straight leg raise on the right, but normal strength and gait, and that the remainder of his physical exam was within normal limits. (Tr. 112.) Ms. Schepers found that plaintiff should avoid concentrated exposure to extreme cold, fumes and other environmental irritants, and hazards. (Tr. 115.) Ms. Schepers opined that plaintiff's reports of pain and limitations far exceeded the objective medical findings, and deemed his allegations "partially credible at best." (Tr. 116.) She further opined that Dr. Hudson provided no

---

[18]At the commencement of the hearing, the ALJ indicated that Ms. Schepers was a state agency employee, and that the record did not reveal that she had any medical qualifications. (Tr. 35.)

indication of why he imposed such strict limitations on plaintiff's activity, and that he provides no objective medical evidence to limit plaintiff. (Tr. 117.)

In a separate form entitled "Explanation of Determination," also dated November 4, 2002, Ms. Schepers indicated that she had based her RFC assessment "primarily" on the examination of Dr. Demorlis, and stated that his objective findings warranted a medium RFC. (Tr. 73.)

On December 11, 2002, plaintiff saw Dr. Hudson with complaints of numbness in his hands and feet. (Tr. 160.) Dr. Hudson diagnosed a herniated lumbar disc with impingement, which was causing paresthesias. Id. There is, however, no radiological report on file, nor is there any indication that plaintiff underwent any radiological studies to confirm this diagnosis. Plaintiff was given Prednisone. Id. This the last treatment note from Dr. Hudson in the record.[19]

Records from the Veteran's Administration Hospital ("VA") indicate that plaintiff was seen on April 22, 2003 for complaints of back pain, and reported a history of kidney stones and left flank pain. (Tr. 237-38.) Plaintiff reported developing low, right-sided back pain while hunting. (Tr. 237.) Plaintiff was noted to be in mild distress, and laboratory tests were performed.

---

[19]Following the hearing on April 23, 2004, plaintiff's attorney told the ALJ that Dr. Hudson's office had refused his repeated requests for updated medical records. (Tr. 57.) It is, therefore, unclear from the record whether plaintiff saw Dr. Hudson after December 11, 2002.

(Tr. 236-37.)  The diagnostic impression was renal colic, and plaintiff was hydrated and given Demerol and Percocet.  (Tr. 237.) He was told to return if the pain intensified, or if he became febrile.  (Tr. 237.)

Plaintiff returned to the VA on April 25, 2003 with complaints of scrotal tenderness and blood in his urine, and stated that he had experienced three attacks of kidney pain since his last visit.  (Tr. 231, 233.)  Chronic low back pain was noted in plaintiff's past medical history. (Tr. 231.)  Plaintiff was tender to palpation in the bilateral inguinal regions and scrotum.  (Tr. 232.)  Stones were noted in plaintiff's left kidney.  (Tr. 232.) Plaintiff was diagnosed with Nephrolithiasis[20], and referred to urology.  Id.  On May 28, 2003, plaintiff returned with complaints of flank pain and urinary trouble, and was scheduled for IVP[21] and cystoscopy.[22]  (Tr. 230.)

Plaintiff returned to the VA the following day, and it was noted that plaintiff indicated he wished to establish a primary care physician.  (Tr. 224.)  Plaintiff reported experiencing chronic back pain due to injuries over the years.  Id.  It is indicated that plaintiff was laid off from his job last August, and

_____

[20]Nephrolithiasis refers to the process of forming a kidney stone. http://www.nlm.nih.gov/medlineplus/ency/article/000458.htm

[21]An IVP, or intravenous pyelogram, is a radiological procedure used to visualize abnormalities of the urinary system. http://en.wikipedia.org/wiki/Intravenous_pyelogram

[22]Cystoscopy is the term used to describe endoscopy of the urinary bladder via the urethra.  http://en.wikipedia.org/wiki/Cystoscopy

that his wife was the only one working due to plaintiff's back problems.  Id.  Plaintiff also reported feeling increasingly down and nervous over the last four years.  Id.  Plaintiff stated that the longer he  sat, the more pain he had in his back.  (Tr. 224.) Upon exam, plaintiff had full range of motion, walked without difficulty, had 5/5 muscle strength bilaterally, equal handgrips, no atrophy or tremors, but a positive straight leg raise test on the left.  Id.  The assessment was chronic low back pain, allergies, and a history of kidney stones.  (Tr. 226.)  Plaintiff was referred to "Dr. Roja" for pain management, and x-rays were ordered.  (Tr. 226.)  The record further indicates that plaintiff was given allergy medications and Terazosin.[23]  (Tr. 223.)

On June 2, 2003, plaintiff presented to the urology department of the VA and reported his history of blood in his urine, and stated that he had recently passed a stone.  (Tr. 221-22.)  Plaintiff's IVP showed no calcifications.  (Tr. 222-23.)

Radiological studies of plaintiff's lumbar spine, taken on June 2, 2003, revealed degenerative changes with osteophytes[24] in plaintiff's mid and lower thoracic spine.  (Tr. 244.)  Images of plaintiff's lumbar spine revealed osteophytes in the lumbar spine, and very slight disk space narrowing at L4-5.  Id.  The impression

_____

[23]Terazosin is used in men to treat the symptoms of an enlarged prostate, including various urinary difficulties.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a693046.html

[24]Osteophytes, also called bone spurs, are bony projections that form along joints, most commonly from the onset of arthritis.
http://en.wikipedia.org/wiki/Bone_spur

was degenerative changes with osteophytes in the mid and lower thoracic spine, and degenerative changes of the lumbar spine. <u>Id.</u> X-rays of plaintiff's abdomen revealed small calcifications in plaintiff's left kidney. (Tr. 246.)

On June 12, 2003, plaintiff presented to the VA. (Tr. 219.) Plaintiff was seen by nurse Janene M. Nolie, who wrote as follows: "Here today to see Dr. Roja for pain management yet deferred to me today d/t (due to) increased LFT - - would be unable to continue hydrocodone - - Remains to complain of back pain."[25] <u>Id.</u> (parenthetical notation added). It was noted that plaintiff was taking Cyclobenzaprine (Flexeril), Fluticasone (Flonase), Loratadine,[26] Sertraline (Zoloft)[27], Sulfamethoxazole,[28] and Terazosin. <u>Id.</u> Plaintiff reported an improvement in his mood. (Tr. 220.) Plaintiff was assessed with chronic low back pain, allergies, and depression, and was given Ultram[29] and Capsaicin

_____

[25]"LFT" is an abbreviation which stands for "Liver Function Test."
http://en.wikipedia.org/wiki/List_of_medical_abbreviations#C

[26]Loratadine is used to temporarily relieve the symptoms of hay fever.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a697038.html

[27]Sertraline, or Zoloft, is used to treat depression, anxiety, and other psychological disturbances.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a697048.html

[28]Sulfamethoxazole is an antibiotic, often used in conjunction with trimethoprim, to treat bacterial infections.
http://en.wikipedia.org/wiki/Sulfamethoxazole

[29]Ultram, or Tramadol, is used to relieve moderate to moderately severe pain.  http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a695011.html

cream.[30] (Tr. 221.)  It is indicated that plaintiff's liver functioning testing would be repeated, and an acute hepatitis panel would also be completed.  Id.

On June 25, 2003, plaintiff returned to the VA with complaints of back pain and was seen in physical therapy.  (Tr. 217.) Plaintiff reported a 20-year history of increasing back pain with an exacerbation that caused him to stop working.  (Tr. 218.) Plaintiff reported that he went fishing and felt numbness up his back and into his neck after two hours.  Id.  Plaintiff reported that sitting, driving and standing worsened his symptoms.  Id. Plaintiff's range of motion was somewhat limited.  Id.  It was opined that plaintiff would benefit from performing exercises on a regular basis "and should be able to improve his pain." (Tr. 218.)

Plaintiff returned to the VA for follow-up on July 15, 2003.  (Tr. 214-15.)  His "active problem" was noted to be chronic low back pain, allergies, depression, tobacco use disorder, and calculi.  (Tr. 214.)  It was noted that plaintiff was taking Tramadol, inter alia.  (Tr. 215.)  He stated that he had also been taking his wife's medication to aid sleep, stating that a forthcoming event was causing anxiety.  (Tr. 215.)  Plaintiff's physical exam was normal, and he was noted to be in no apparent distress.  Id.  He was assessed with chronic low back pain, and

---

[30]Capsaicin cream is used for temporary relief of muscle and joint pain associated with arthritis, simple backaches, sprains, strains, and bruises. http://www.drugs.com/cdi/capsaicin-cream.html

advised to continue his physical therapy exercises and his current pain medications, and his Zoloft dosage was increased. (Tr. 217.)

On March 31, 2004, Dr. Hudson completed a medical source statement of plaintiff's ability to do work-related activities. (Tr. 209-12.) Dr. Hudson opined that plaintiff could lift/carry "nothing at all," could stand no longer than 15 minutes, could walk no longer than five minutes, could sit no longer than 30 minutes, and could not push or pull anything. (Tr. 209-10.) When asked to indicate the medical/clinical findings supporting these conclusions, Dr. Hudson wrote as follows:

> Back pain has gotten much worse, any bending, lifting, stooping, walking, reaching, climbing, sitting or standing too long cause symptoms to get worse. Pain is sometimes sharp but is always throbbing. The pain starts in lower back, moves up back & down legs. Can't do anything without pain, lying down is about the only comfortable position.

(Tr. 210.)

Dr. Hudson further opined that plaintiff could never climb, crouch, crawl or stoop, and should only occasionally balance and kneel, and in support stated that plaintiff was unable to do anything without severe pain, and that everything was very difficult and painful. Id. Dr. Hudson also opined that plaintiff's ability to reach and manipulate was limited due to pain, and that plaintiff should avoid vibration and hazards such as machinery and heights due to pain. (Tr. 211-12.)

Records from St. John's Clinic indicate that plaintiff

was seen on December 10, 2004 to establish care, indicating that he had previously received treatment from Dr. Hudson and the VA.[31] (Tr. 269.) Plaintiff reported chronic back pain and numerous injuries to his back, and stated that he had filed for disability. Id. Plaintiff also reported decreased hearing in his right ear, and wanted a hearing aid. Id. Plaintiff reported trouble taking Zoloft, and had feelings of anxiousness and forgetfulness. Id. Upon exam, plaintiff was tender across the lumbosacral spine. (Tr. 270.) The assessment was back pain, depression and anxiety, and plaintiff was given Naprosyn,[32] Soma, and Vicodin,[33] a Lidoderm patch,[34] and Effexor.[35] Id. It is indicated that an MRI was ordered. Id.

Plaintiff returned to St. John's on January 8, 2005 for a check-up and "to discuss recent xrays." (Tr. 267.) He reported

---

[31]The records from St. John's Clinic were received and considered by the Appeals Council. (Tr. 2-6.) When the Appeals Council considers new evidence, the reviewing court does not evaluate the decision to deny review, but must undertake the "peculiar task" of determining whether the record as a whole, which now includes the including the new evidence, supports the ALJ's determination. Riley v. Shalala, 18 F.3d 619, 622 (8th Cir.1994).

[32]Naprosyn is used to relieve pain, tenderness, swelling and stiffness associated with different types of arthritis. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a681029.html

[33]Vicodin is a combination of the drugs Acetaminophen and Hydrocodone, and is used to relieve moderate to moderately severe pain. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a601006.html

[34]A Lidoderm patch is topical Lidocaine, and is a local anesthetic used to relieve burning, stabbing aches and pains. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a603026.html

[35]Effexor, or Venlafaxine, is used to treat depression. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a694020.html

continued back pain, and said it hurt to sit for very long.  Id.
Plaintiff also complained of right knee pain.  Id.  It is noted
that plaintiff's depression had improved on Effexor, but that he
felt irritable later in the day.  Id.  Upon exam, plaintiff was
tender over the lateral aspect of his right knee and across the
lumbosacral spine, and he had a depressed affect. (Tr. 268.)  The
section marked "Recent/old X-rays reviewed" was left blank, and
there is no mention elsewhere in the record of the MRI that was
apparently ordered when plaintiff was last seen. See (Tr. 267-68.)
The assessment was depression, low back pain and right knee pain.
(Tr. 268.)  Plaintiff's Effexor dosage was increased, and his other
medications were refilled.  Id.  It is indicated that plaintiff
would be referred to a neurosurgeon, either in Springfield, St.
Louis, or Columbia, to evaluate his spine.  Id.

        Plaintiff returned to St. John's on March 7, 2005 for a
check-up and medication refill.  (Tr. 265.)  It is noted that he
was unable to sit or stand for extended periods, and that he was
"trying to get disability."  Id.  The Clinic note indicates that
plaintiff had seen a "Dr. Lee" in Springfield the preceding week,
but was unsure what he had recommended.  Id.  This notation further
indicates that plaintiff had been given an order for physical
therapy, but did not have it with him.  Id.

        Upon exam, plaintiff was tender across his lumbosacral
spine.  (Tr. 266.)  He was assessed with back pain and right knee
pain.  Id.  It is indicated that plaintiff would begin physical

therapy, and continue taking Vicodin and Soma.  Id.  This is the final treatment note from St. John's Clinic.

## III.    The ALJ's Decision

The ALJ found that plaintiff had not engaged in substantial gainful activity since the alleged onset date.  (Tr. 29.)  The ALJ found that, although plaintiff had the "severe" impairments of degenerative changes of the lumbar and cervical spine, and chronic lumbar strain, these medically determinable impairments were not of listing-level severity.  Id.

The ALJ found that plaintiff was unable to perform his past relevant work, classified as heavy, due to documented degenerative changes of the lumbar and cervical spine, and the fact that plaintiff was susceptible to lumbar strain.  (Tr. 27.)  The ALJ found that plaintiff retained the RFC to perform the full range of medium work, inasmuch as he could sit, stand or walk at least six hours in an eight-hour workday; could lift 25 pounds frequently and 50 pounds occasionally; and had no postural or environmental limitations.  (Tr. 30.)  Relying upon the Guidelines, the ALJ concluded that plaintiff was not under a disability as defined in the Act at any time through the date of the decision.  Id.

In determining plaintiff's RFC, the ALJ noted that the medical record established that plaintiff had degenerative changes in the cervical and lumbar spine, but that there was no evidence of

any nerve root compression via herniated disc or bony abnormality. (Tr. 27.) The ALJ wholly rejected as conclusory the opinion of Dr. Hudson, plaintiff's treating physician, who initially limited plaintiff to sedentary work, but later opined that plaintiff was completely unable to lift. Id. The ALJ noted that Dr. Hudson's treatment notes failed to show any significant objective worsening of plaintiff's condition that might warrant the decrease in his ability to lift. Id. The ALJ wrote: "It appears that Dr. Hudson's assessment is based only on the claimant's subjective symptoms and not upon any anatomical and physiological abnormality demonstrated on physical exam." Id. The ALJ noted that the record as a whole was also devoid of evidence of any significant sensory, reflex or motor deficit, or evidence of severe or persistent muscle spasm or atrophy due to disuse. (Tr. 27.) The ALJ also noted that he found it significant that the reports of plaintiff's physical examinations at the VA Hospital failed to reveal that plaintiff was in any severe distress. Id.

The ALJ found that plaintiff's allegations regarding his limitations were "not totally credible for the reasons set forth in the body of the decision." (Tr. 30.) In the body of the decision, regarding his credibility determination, the ALJ wrote as follows:

> In making this assessment, the undersigned has considered all symptoms, including pain, and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence based on the requirements of 20 C.F.R. §§ 404.1529 and 416.929, and Social Security

Ruling 96-7p. The undersigned has also
considered all medical opinions, which are
statements from acceptable medical sources,
which reflect judgments about the nature and
severity of the impairments and resulting
limitations (20 C.F.R. §§ 404.1527 and
416.927 and Social Security Ruling 96-2p and
96-6p).

(Tr. 28.)

The foregoing is the only language in the decision
related to credibility determination. The ALJ did not cite Polaski
v. Heckler, 739 F.2d 1320 (8th Cir. 1984), nor did he discuss any
of the factors essential to credibility determination.


## IV. Discussion

To be eligible for Social Security disability benefits
and Supplemental Security Income under the Social Security Act,
plaintiff must prove that he is disabled. Pearsall v. Massanari,
274 F.3d 1211, 1217 (8th Cir. 2001); Baker v. Secretary of Health
& Human Services, 955 F.2d 552, 555 (8th Cir. 1992). The Social
Security Act defines "disability" in terms of the effect a physical
or mental impairment has on a person's ability to function in the
workplace. It provides disability benefits only to persons who are
unable to "engage in any substantial gainful activity by reason of
any medically determinable physical or mental impairment which can
be expected to result in death or which has lasted or can be
expected to last for a continuous period of not less than twelve

-24-

months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  It further specifies that a person must "not only [be] unable to do his previous work but [must be unable], considering his age, education, and work experience, [to] engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. § 423(d)(2)(A); Bowen v. Yuckert, 482 U.S. 137, 140 (1987); Heckler v. Campbell, 461 U.S. 458, 459-460 (1983).

        To determine whether a claimant is disabled, the Commissioner utilizes a five-step evaluation process.  See 20 C.F.R. §§ 404.1520, 416.920; Bowen, 482 U.S. at 140-42.  The Commissioner begins by considering the claimant's work activity. If the claimant is engaged in substantial gainful activity, disability benefits are denied.  Next, the Commissioner decides whether the claimant has a "severe impairment," meaning one which significantly limits his ability to do basic work activities.  If the claimant's impairment is not severe, then he is not disabled. The Commissioner then determines whether claimant's impairment meets or is equal to one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1.  If claimant's impairment is equivalent to one of the listed impairments, he is conclusively disabled.  At the fourth step, the Commissioner establishes whether the claimant has the residual functional capacity to perform his or her past

relevant work.  If so, the claimant is not disabled.  If not, the burden then shifts to the Commissioner to prove that there are other jobs that exist in substantial numbers in the national economy that the claimant can perform.  <u>Pearsall</u>, 274 F.3d at 1217, <u>Nevland v. Apfel</u>, 204 F.3d 853, 857 (8th Cir.  2000).  Absent such proof, the claimant is declared disabled and becomes entitled to disability benefits.

The Commissioner's findings are conclusive upon this Court if they are supported by substantial evidence.  42 U.S.C. § 405(g); <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971); <u>Young o/b/o Trice v. Shalala</u>, 52 F.3d 200 (8th Cir. 1995), <u>citing</u> <u>Woolf v. Shalala</u>, 3 F.3d 1210, 1213 (8th Cir. 1993).  Substantial evidence is less than a preponderance, but enough that a reasonable person would find  adequate to support the conclusion.  <u>Briggs v. Callahan</u>, 139 F.3d 606, 608 (8th Cir. 1998).  To determine whether the Commissioner's decision is supported by substantial evidence, the Court must review the entire administrative record and consider:

1.  The credibility findings made by the ALJ;

2.  The plaintiff's vocational factors;

3.  The medical evidence from treating and consulting physicians;

4.  The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments;

5.  Any corroboration by third parties of the plaintiff's impairments;

> 6. The testimony of vocational experts, when required, which is based upon a proper hypothetical question which sets forth the plaintiff's impairment.

Stewart v. Secretary of Health & Human Services, 957 F.2d 581, 585-86 (8th Cir. 1992), (quoting Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

The Court must also consider any "evidence which fairly detracts from the ALJ's findings." Groeper v. Sullivan, 932 F.2d 1234, 1237 (8th Cir. 1991); see also Briggs, 139 F.3d at 608. However, where substantial evidence supports the Commissioner's decision, the decision may not be reversed merely because substantial evidence may support a different outcome. Briggs, 139 F.3d at 608; Browning v. Sullivan, 958 F.2d 817, 821 (8th Cir. 1992), citing Cruse, 867 F.2d at 1184.

In the case at bar, plaintiff contends that the ALJ's decision is not supported by substantial evidence, inasmuch as there is no medical evidence to support the ALJ's RFC determination. In support, plaintiff argues that the ALJ failed to state what particular medical opinions would support his RFC determination, and further argues that the record in fact contains no RFC determination from a physician to support the conclusion that plaintiff could lift 25 pounds frequently and 50 pounds occasionally. In response, the Commissioner argues that substantial evidence supports the ALJ's decision.

A.    Credibility Determination

-27-

As discussed, _supra_, the ALJ in this case discredited plaintiff's complaints of symptoms precluding all work. Although plaintiff does not directly challenge the ALJ's credibility determination, he does challenge the ALJ's RFC determination, of which credibility determination is a crucial element. An ALJ must evaluate a claimant's credibility before determining his RFC. _Tellez v. Barnhart_, 403 F.3d 953, 957 (8th Cir. 2005). Furthermore, this Court is required to review the entire administrative record and consider the ALJ's credibility determination, among other factors, to evaluate whether the decision is supported by substantial evidence. _Stewart_, 957 F.2d at 585-86 (quoting _Cruse_, 867 F.2d at 1184-85.) A review of the record shows that the ALJ's credibility determination is not supported by substantial evidence on the record as a whole.

"A claimant has the burden of proving that his disability results from a medically determinable physical or mental impairment." _Polaski_, 739 F.2d at 1321. However, testimony regarding pain is necessarily subjective in nature, as it is the claimant's own perception of the effects of his alleged physical impairment. _Id._ Because of the subjective nature of physical symptoms, and the absence of any reliable technique for their measurement, it is difficult to prove, disprove or quantify their existence and/or overall effect. _Polaski_ at 1321-22. In _Polaski_, the Eighth Circuit addressed this difficulty, and established the following standard for the evaluation of subjective complaints:

"The absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints. The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as: (1) the claimant's daily activities; (2) the duration, frequency and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; (5) functional restrictions."

Id. at 1322.

Although an ALJ is not required to specifically cite the Polaski decision or to methodically discuss each Polaski factor in detail, the ALJ must acknowledge and examine the foregoing factors, and must give good reasons for discrediting the claimant's subjective complaints. Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000) (citing Brown v. Chater, 87 F.3d 963, 966 (8th Cir. 1996)); see Hogan v. Apfel, 239 F.3d 958, 962 (8th Cir. 2001). Furthermore, while an ALJ may discount the claimant's complaints if there are inconsistencies in the evidence as a whole, the ALJ may not determine that a claimant is not credible "solely because the complaints are not fully supported by the objective medical evidence." Halpin v. Shalala, 999 F.2d 342, 346 (8th Cir. 1993).

In this case, as in Halpin, plaintiff testified before the ALJ that his back pain was severe, nearly constant, and caused significant functional limitations. Plaintiff testified that he

often "pulled" his back when performing simple maneuvers such as walking across the floor or picking up something, and that the resulting pain sometimes caused him to fall. He testified that back pain often prompted him to stop what he was doing, take a pain pill, and lay down. He testified that pain sometimes limited his ability to dress himself or get out of bed, and that he sometimes required assistance with these tasks. He testified that he is no longer able to bowl, play golf, or hunt like he once did. Plaintiff testified that he slept for only about five or six hours per night and was unable to get a restful night's sleep, whereas he slept for eight or nine hours without difficulty before hurting his back. He testified that, despite his attempts, he is unable to maintain any activity for very long due to back pain.

Plaintiff presently takes, and has taken since the alleged date of onset, several different strong prescription pain medicines, none of which seem to have provided full relief. Furthermore, plaintiff has availed himself, or has sought to avail himself and been unable to commence, different treatment modalities such as physical therapy, epidural steroid injections, and pain management.

The record further establishes that plaintiff had a very strong work record. Plaintiff worked for two different mining companies, doing essentially the same work, for many years immediately preceding the 2002, the alleged onset date. This strong work history is consistent with, and is bolstered by,

plaintiff's testimony that he had enjoyed his work, had particularly enjoyed the varied nature of it and missed working, that his last job was the best job he had ever had, and that he had planned to work until age 65. Plaintiff's consistent work record prior to 2002 supports the credibility of his disability complaint. See Singh v. Apfel, 222 F.3d 448, 453 (8th Cir. 2000). Finally, plaintiff's wife testified on his behalf, and her testimony corroborated plaintiff's. Mrs. Barton testified that she sometimes helped plaintiff get out of bed in the morning and dress, and that, at times, plaintiff could hardly get around.

The administrative record in this case contains insufficient evidence to allow the ALJ to discount plaintiff's complaints of disabling pain. See Bowman v. Barnhart, 310 F.3d 1080 (8th Cir. 2002) (ALJ improperly discredited claimant who had impairments which could cause chronic pain; claimant's physicians had prescribed drugs used to treat moderate to severe pain, and there was no evidence that medications had alleviated claimant's symptoms to point that she could return to her previous job.) Although the ALJ in this case wrote that he had considered plaintiff's complaints pursuant to 20 C.F.R. §§ 404.1529 and 416.929, and Social Security Ruling 96-7p, which correspond to Polaski and credibility determination, he failed to list even one of the necessary factors, and failed to offer any discussion indicating his reasons for discrediting plaintiff. If an ALJ discredits a claimant and gives good reasons, this Court will defer

to that decision even if every Polaski factor is not discussed in depth. Dunahoo v. Apfel, 241 F.3d 1033, 1038 (8th Cir. 2001). Although the ALJ herein stated that there were inconsistencies in the record as a whole, the undersigned sees no evidence in the record to dispute plaintiff's claim that his back pain significantly restricts any kind of sustained physical activity he attempts. It is not enough that the ALJ sees inconsistencies in the record; the ALJ must demonstrate that he has considered all of the evidence. Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992).

In this case, it appears that the only factor the ALJ weighed with any significance at all was the relative lack of objective medical evidence to support the degree of severity of plaintiff's subjective complaints. This is a legally insufficient manner in which to discredit a claimant's subjective complaints. As the Eighth Circuit held in Halpin, "[s]uch strict reliance on the absence of objective medical evidence is, as we have repeatedly held, contrary to the law of this circuit." Halpin, 999 F.2d at 346 (citing Beeler v. Bowen, 833 F.2d 124, 127 (8th Cir. 1987)); see also Eichelberger v. Barnhart, 390 F.3d 584, 589 (8th Cir. 2004) (An ALJ may not disregard subjective complaints merely because there is no evidence to support the complaints, but may disbelieve subjective reports because of "inherent inconsistencies or other circumstances.") While an ALJ is entitled to consider the lack of objective medical findings when evaluating credibility,

this is only one factor to be considered.  McClees v. Shalala, 2 F.3d 301, 302 (8th Cir. 1993).

For the foregoing reasons, the undersigned concludes that the ALJ's credibility determination is not supported by substantial evidence in the record as a whole, nor does it comply with the Eighth Circuit's mandate set forth in Polaski.


B.    RFC Determination

The ALJ in this case found that plaintiff retained the RFC to perform the full range of medium work, inasmuch as he could sit, stand or walk at least six hours in an eight-hour workday; could lift 25 pounds frequently and 50 pounds occasionally; and had no postural or environmental limitations.  Plaintiff argues that the record lacks medical evidence to support these findings.  The undersigned agrees.

Residual functional capacity is what a claimant can do despite his limitations.  20 C.F.R. § 404.1545, Lauer v. Apfel, 245 F.3d 700, 703 (8th Cir. 2001).  The ALJ must assess a claimant's RFC based upon all relevant, credible evidence in the record, including medical records, the observations of treating physicians and others, and the claimant's own description of his symptoms and limitations.  Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995); Goff v. Barnhart, 421 F.3d 785, 793 (8th Cir. 2005); 20 C.F.R. §§ 404.1545(a), 416.945(a).  An ALJ is not limited to considering only medical evidence, nor is an ALJ required to

produce evidence and affirmatively prove that a claimant can lift a certain weight or walk a certain distance. <u>Pearsall</u>, 274 F.3d at 1217 (8th Cir. 2001); <u>McKinney v. Apfel</u>, 228 F.3d 860, 863 (8th Cir. 2000); <u>Lauer</u>, 245 F.3d at 704. The claimant bears the burden of establishing his RFC. <u>Goff</u>, 421 F.3d at 790.

A claimant's RFC is a medical question. <u>Lauer</u>, 245 F.3d at 704; <u>Singh</u>, 222 F.3d at 451; <u>Hutsell v. Massanari</u>, 259 F.3d 707, 712 (8th Cir. 2001). "To properly determine a claimant's residual functional capacity, an ALJ is therefore 'required to consider at least some supporting evidence from a [medical] professional.'" <u>Hutsell</u>, 259 F.3d at 712 (parenthetical notation in original). A reviewing court has the duty of determining whether the record presents medical evidence of the claimant's RFC at the time of the hearing. <u>Frankl v. Shalala</u>, 47 F.3d 935, 937-38 (8th Cir. 1995). Unless the record contains such evidence, the ALJ's decision cannot be said to be supported by substantial evidence. <u>Id.</u> An ALJ's RFC assessment which is not properly informed and supported by some medical evidence in the record cannot stand. <u>Hutsell</u>, 259 F.3d at 712.

It is well-settled law that the ALJ is required to ensure a fully and fairly developed record. <u>Nevland</u>, 204 F.3d 853 (citing <u>Warner v. Heckler</u>, 722 F.2d 428, 431 (8th Cir. 1983)). Included in this duty is the responsibility of ensuring that the record contains evidence from a treating physician, or at least an examining physician, addressing the claimant's "ability to function

in the workplace." <u>Lauer</u>, 245 F.3d 704.

In the case at bar, the ALJ's RFC assessment was not properly informed, nor was it supported by medical evidence from a medical professional. <u>See</u> <u>Hutsell</u>, 259 F.3d at 712. The ALJ's RFC determination is identical to the RFC assessment of Ms. Schepers, and it appears that the ALJ relied entirely upon this assessment in determining plaintiff's RFC. As the ALJ himself noted at the commencement of plaintiff's hearing, the record contains no evidence that Ms. Schepers is a medical professional, and her opinion therefore cannot be considered to be medical evidence from a medical professional to support the ALJ's RFC determination. As noted above, RFC is a medical issue, <u>Singh</u>, 222 F.3d at 451, and requires the consideration of supporting evidence from a medical professional. <u>Hutsell</u>, 259 F.3d at 712.

Furthermore, Ms. Schepers indicated that she based her RFC Assessment largely on her review of the medical report of Dr. Demorlis. This is legally insufficient. The Eighth Circuit has held that RFC assessments based upon review of other records, without an actual examination, are not entitled to substantial weight. <u>Taylor v. Chater</u>, 118 F.3d 1274, 1279 (8th Cir. 1997); <u>Gilliam v. Califano</u>, 620 F.2d 691, 693 (8th Cir. 1980) (paper reviews, without an actual examination, are entitled to little weight). Second, Dr. Demorlis was not a treating physician; he was a consulting physician who examined plaintiff only once. "The opinion of a consulting physician who examines a claimant once or

not at all does not generally constitute substantial evidence."
Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir. 1998).  Finally,
Dr. Demorlis wholly failed to offer an opinion regarding how
plaintiff's impairments affected his ability to function in the
workplace.  Because of this failure, his report cannot form the
basis for an assessment of plaintiff's functional ability.  An ALJ
may not draw his own inferences from medical reports.  Nevland, 204
F.3d at 858 (citing Lund v. Weinberger, 520 F.2d 782, 785 (8th Cir.
1975)).

    The record contains no medical evidence which could be
interpreted as supporting the ALJ's RFC determination.  In fact,
the medical evidence of record shows that plaintiff has, from 1999
through and beyond the date of the hearing, repeatedly and
consistently sought and received medical treatment, including
strong prescription medication, for complaints of back pain.  In
addition, when plaintiff has presented himself for treatment, his
back complaints are consistent, both within the medical records
themselves, and with the complaints plaintiff described during his
hearing testimony.  Furthermore, the pain he consistently
complained of during his medical examinations and described during
his hearing is directly attributable to an objective medical
finding of degenerative changes with osteophytes in his lumbar
spine.  See 42 U.S.C. § 423 (d)(5)(A) (complaints of pain or
symptoms "shall not alone be conclusive evidence of disability ...
there must be medical signs and findings, established by medically

acceptable clinical or laboratory diagnostic techniques.")

Plaintiff most recently sought medical treatment at the VA Hospital and at St. John's Clinic. The VA Hospital records indicate consistent complaints of back pain, which continued from exam to exam despite the fact that plaintiff was taking strong prescription pain medication. The VA records further reflect that plaintiff was referred for physical therapy, and was referred to a physician for pain management. Plaintiff was unable to begin pain management treatment due to the results of laboratory testing which contra-indicated the use of Hydrocodone. During plaintiff's hearing, he testified that he was still receiving treatment at the VA, and the VA records do not indicate that plaintiff has been discharged from care.

The St. John's Clinic records, as noted, supra, were received and reviewed by the Appeals Council following plaintiff's administrative hearing. When the Appeals Council considers newly submitted evidence but denies review, the reviewing court does not evaluate the decision to deny review, but instead must determine whether substantial evidence on the record as a whole, which now includes the new evidence, supports the ALJ's decision. Riley v. Shalala, 18 F.3d 619, 622 (8th Cir. 1994). The Eighth Circuit has noted that this is a "peculiar task" because it essentially requires speculation on how the ALJ would have weighed the new evidence given the opportunity. Id.

The St. John's Clinic records offer no support for the

ALJ's decision. During his course of treatment at St. John's, plaintiff's complaints of back pain were internally consistent, and were consistent with the other medical evidence of record and with plaintiff's hearing testimony. Plaintiff further complained that his pain limited his ability to sit and stand. The records indicate that an MRI of plaintiff's back was ordered, and that he was referred to, and apparently saw, a specialist. Finally, there is no indication that St. John's discharged plaintiff from care.

The record also reflects plaintiff's long history of treatment for back complaints with Dr. Hudson, and includes a letter dated August 26, 2002 and an MSS dated March 31, 2004 in which Dr. Hudson opined that plaintiff had severe functional limitations. In his decision, the ALJ wrote that he gave no weight to Dr. Hudson's opinion because plaintiff had apparently not seen Dr. Hudson since December 2002, and because Dr. Hudson failed to describe any "real objective abnormalities" of plaintiff in his physical findings. (Tr. 27.) Because the ALJ does not specify which of Dr. Hudson's opinions he is referring to, the undersigned will assume herein that he rejected both.

The undersigned cannot conclude that Dr. Hudson's August 26, 2002 letter was entitled to substantial, if any weight, inasmuch as Dr. Hudson wholly failed to include any medical information whatsoever in that correspondence. A treating physician's opinion is given controlling weight "if it is well-supported by medically acceptable clinical and laboratory

-38-

diagnostic techniques and is not inconsistent with the other substantial evidence." <u>Reed v. Barnhart</u>, 399 F.3d 917, 920 (8th Cir. 2005).

However, the rationale offered by the ALJ was insufficient to support rejection of Dr. Hudson's March 31, 2002 opinion. Whether the ALJ grants a treating physician's opinion substantial or little weight, the regulations provide that the ALJ must "always give good reasons" for the particular weight given. 20 C.F.R. § 404.1527(d)(2); <u>Prosch v. Apfel</u>, 201 F.3d 1010, 1012-13 (8th Cir. 2000). As one of his reasons for discounting the opinion of Dr. Hudson, the ALJ indicated that plaintiff had apparently not seen Dr. Hudson since December 2002. As noted above, at the conclusion of the hearing, plaintiff's attorney told the ALJ that he had made repeated, unsuccessful attempts to obtain updated records from Dr. Hudson. It therefore cannot be said with sufficient certainty that Dr. Hudson did not see plaintiff after December 2002, and this is not a good reason for discrediting Dr. Hudson's March 31, 2004 opinion. Furthermore, it cannot be said that Dr. Hudson's medical records are inconsistent with the balance of the medical information of record, inasmuch as they document plaintiff's continuous complaints of severe back pain despite his use of strong prescription pain medication.

If the ALJ believed that the evidence Dr. Hudson was inadequate, he was under an obligation to re-contact Dr. Hudson. 20 C.F.R. § 404.1512(e) ("When the evidence we receive from your

treating physician ... is inadequate for us to determine if you are disabled ... [w]e will ... recontact your treating physician ... to determine whether the additional information we need is readily available."). Although the regulations do not require an ALJ to re-contact a treating physician whose opinion was inherently contradictory or unreliable, especially when the ALJ is able to determine from the record whether the applicant is disabled, that is not the case here. <u>Sultan v. Barnhart</u>, 368 F.3d 857, 863 (8th Cir. 2004). Dr. Hudson's opinion is consistent with his treatment notes which, while documenting no objective medical findings, do document continuous complaints of severe pain. Dr. Hudson's treatment notes are also consistent with the balance of the medical evidence of record, and nothing in Dr. Hudson's treatment records, or in any of the other medical evidence of record, is inconsistent with plaintiff's subjective assertions that he is disabled and unable to engage in gainful employment.

Because the record does not present sufficient medical evidence of the claimant's RFC at the time of the hearing, the undersigned concludes that the ALJ's decision is not supported by substantial evidence on the record as a whole, including the new evidence reviewed by the Appeals Council. <u>See</u> <u>Frankl</u>, 47 F.3d at 937-38; <u>see also</u> <u>Riley</u>, 18 F.3d at 622.


For all of the foregoing reasons, the Commissioner's

decision that plaintiff was not under a disability as defined in the Act, that he retained the residual functional capacity to perform medium work, and that his allegations of symptoms precluding all work is not supported by substantial evidence on the record as a whole.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **REVERSED** and the cause shall be **REMANDED** to the Commissioner for further proceedings consistent with this Memorandum and Order.

Judgment shall be entered accordingly.


_____
UNITED STATES MAGISTRATE JUDGE

Dated this 10th day of March, 2008.